Affirmed and Opinion filed June 15, 2004









Affirmed and Opinion filed June 15, 2004.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00402-CR

____________

 

LISA MARIE SEARCY, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 178th
District Court

Harris County, Texas

Trial Court Cause No. 942,126

 



 

O P I N I O N

Appellant, Lisa Marie Searcy, was charged
by indictment, and subsequently convicted by a jury, for delivering at least
400 grams of methamphetamine.  Thereafter,
the jury assessed her punishment at confinement in the Texas Department of
Criminal Justice, Institutional Division for a term of twenty years and a $500
fine.  On appeal, appellant complains the
trial court erred in failing to sua sponte instruct jurors to consider
evidence of extraneous offenses and bad acts at the punishment stage only if
they first determined beyond a reasonable doubt that she committed those
offenses  We affirm.








Michael Martinez was working as a
confidential informant.  On May 30, 2002,
appellant, along with two females friends, was at Martinez= apartment.  Martinez= friend, Jesus
Vasallo, was also there.  Appellant=s friends were
doing Aglass@Ca particularly
potent form of methamphetamine. 
Martinez, who had known appellant for about six months, asked her if she
could get some glass for him.  Appellant
replied that she could and made a phone call. 
Appellant told Martinez they would talk again the next day.

On May 31, 2002, Martinez called appellant
and told her he needed seven pounds of glass. 
Because Martinez wanted to see a sample of what appellant had and
appellant wanted to see Martinez= money, they arranged
to meet at a Best Buy store parking lot later that day.  When appellant arrived, Martinez called
someone to drive up with the money. 
Agent Chris Freeman of the Drug Enforcement Agency drove up to Martinez
and appellant, rolled down the window, and showed appellant $10,000 in Aflash@ money.  Appellant left to retrieve the sample.  Martinez thought appellant was taking too
long and called her; they agreed to meet at Doneraki=s restaurant
parking lot where appellant gave Martinez the sample.  Martinez turned the sample over to law
enforcement officers, who conducted a field test that indicated the presence of
methamphetamine.  Martinez talked to
appellant later that day and told her the sample was good and tried to arrange
the delivery of the seven pounds of glass. 
Appellant told Martinez she would sell the glass to him for $15,000 per
pound.  

On June 1, 2002, appellant called
Martinez, stating that she had a more potent upgrade of the drug.  They arranged a meeting for appellant to
provide another sample so that Martinez could determine which potency of
methamphetamine he wanted to purchase. 
They met at a Taco Cabana parking lot, where appellant gave Martinez the
sample.  Martinez again gave the sample
to law enforcement officers.








Martinez and appellant spoke later that
day.  Although Martinez still wanted to
purchase seven pounds, appellant told Martinez that she was going to sell only
one-half pound at first to make sure everything went smoothly.  They arranged to meet at the parking lot of a
Blockbuster store.  Appellant arrived
with three men in a black Lexus.  When
appellant gave Martinez a Cheez-It box containing one-half pound of
methamphetamine, Martinez then called Vasallo to bring the money.  When Vasallo drove up, Martinez gave him the
Cheez-It box and Vasallo gave Martinez $7,750. 
Martinez got in the Lexus and observed appellant and the men count the
money.  When they finished counting the
money, Martinez got out of the car and the appellant and the three men drove
away.  Vasallo turned the Cheez-It box
over to law enforcement officers.

On June 3, 2002,  Martinez spoke with appellant about the
delivery of the remaining six and one-half pounds of glass.  Appellant told Martinez that she would only
deliver two pounds of glass to make sure the transaction went smoothly.  They met later that day at the parking lot of
the Blockbuster where they had previously met. 
Appellant arrived with the same three men in the same Lexus.  Appellant and one of the men got out of the
car.  The man, in appellant=s presence, handed
Martinez a Frosted Flakes box, containing one pound of methamphetamine.  They told Martinez they were giving him only
one pound, instead of two pounds. 
Martinez called Vasallo to purportedly bring the money and then signaled
the law enforcement officers, who moved in and arrested everyone.  

After her arrest, appellant gave a voluntary handwritten
confession to Sergeant Charles Kibble of the Texas Department of Public Safety
assigned to the drug task force:

Friday, Michael
called me to get him 7 lbs of glass and I called around and [E]rnie had
some.  So he brought me a sample at
Benihana=s to give to
Michael.  I met Michael at Doneraki=s and gave it to
him.  Then, on Saturday I brought him
another sample and Saturday evening I went with [E]rnie, Shawn and Juan and
brought Michael a half pound of crystal for seven thousand.  On Monday me, [E]rnie, Shawn and Juan went
with one pound of crystal to the parking lot and it would of been for fourteen
thousand.  Shawn had picked up me and
[E]rnie all of the times and Juan had been with him.  My cut for referral was $250 per lb per each
side.








Appellant testified at her trial that
Martinez had called her on numerous occasions asking if she knew anyone who had
large quantities of drugs.  Even though
she said no, Martinez kept asking. 
Appellant, who owns a nail business, was working with a client on May
30, 2002, when Martinez called. 
Appellant claimed not to know what Aglass@ was, but her
client knew and would talk to her husband, Ernst Roman, about it.  Appellant was going to get the drugs for
Martinez from Roman and would receive $3500, or $250 per pound from each party
to the transaction.  

Appellant, however, further testified that
she did not know the first sample she gave Martinez was methamphetamine;
Martinez only told her to get him a sample. 
When appellant delivered the first sample at the Doneraki=s restaurant
parking lot, she thought she was going to have dinner with Martinez, but as
soon as she got there, he said he had to get back to work.  Appellant also claimed not to know the
purpose of the money.  Instead, she
thought Martinez was just trying to impress her.  

Appellant also testified that she did not
know what was in the Cheez-It box.  She
explained that on June 1, 2002, she had been to a barbeque where she had been
drinking beer and wine coolers. 
Appellant left with Roman and the other men to meet Martinez.  On the way, they stopped at a store to buy
her a box of crackers because she had consumed too much liquor.  Appellant testified that when they arrived at
the Blockbuster parking lot, AJuan asked me, oh,
is that your boyfriend and, um, I said yes, kind of.  And he said, well, give these crackers to
him.  So I was eating the crackers, I
just handed him the box.@ 
Although appellant had been eating crackers out of the same box that she
gave to Martinez, she Awasn=t really conscious
of what was in the box.@ 
Appellant also stated that she did not help count any money.  

With regard to the one-pound transaction
in the Frosted Flakes box on June 3, 2002, appellant claims she never saw the
Frosted Flakes box containing the methamphetamine before trial.  Appellant explained that she was in the same
Lexus with same men as before because her car had transmission problems and she
had an appointment with a client at a restaurant by the Blockbuster where they
met Martinez.  








Although appellant admits she wrote the
statement she gave to Sergeant Kibble, she Adid not read what
was on the paper.@ 
She claims the police told her that she would be prosecuted and would go
to prison, but promised that if she made the statement, they would let her go
and she would not be charged.  Sergeant
Kibble testified that he did not tell appellant that he would not file charges
against her in exchange for her statement. 
He also stated that he did not dictate what she wrote in her
statement.  Sergeant Kibble observed that
appellant did not appear to be intoxicated, but, rather, she appeared Ato have total
control of her mental and physical faculties.@  

Several law enforcement officers were
assigned to the surveillance of the transactions between Martinez and
appellant.  Martinez wore a wireless
transmitter and the officers were able to listen to Martinez and appellant=s conversations
and observe their actions.  The officers= testimony
confirmed Martinez= version of how those events transpired.

In her sole issue on appeal, appellant
claims the trial court should have sua sponte instructed the jury to
consider any evidence of extraneous offenses and/or bad acts at the punishment
stage only if it determined beyond a reasonable doubt that appellant committed
the offenses or bad acts.  Appellant was
charged with the June 3, 2002 one-pound delivery of methamphetamine.  Appellant, however, complains that her other
deliveriesCthe two samples and the half-pound of
methamphetamine, and the offers to sell seven pounds and two pounds of
methamphetamine are extraneous offenses and, therefore, the trial court was
required to instruct the jury on the State=s burden of
proof.  

With respect to extraneous offenses and bad acts, Article
37.07, ' 3(a) of the Texas
Code of Criminal Procedure provides:  

. . . evidence may be offered by the state and the
defendant as to any matter the court deems relevant to sentencing, including
but not limited to . . . evidence of an extraneous crime or bad act that is
shown beyond a reasonable doubt by evidence to have been committed by the
defendant or for which he could be held criminally responsible, . . .








Tex. Code Crim.
Proc. Ann. art. 37.07 ' 3(a)(1) (Vernon
Supp. 2004).  Article 37.07 mandates that
extraneous offenses and bad acts may not be considered in assessing punishment
until after the fact-finder is satisfied beyond a reasonable doubt that they
were committed by the defendant.  Fields
v. State, 1 S.W.3d 687, 688 (Tex. Crim. App. 1999).  In the absence of a request or objection, the
trial court must sua sponte instruct the jury of the State=s burden of
proof.  Huizar v. State, 12 S.W.3d
479, 483 (Tex. Crim. App. 2000).  

We are unpersuaded by appellant=s argument.  First, the evidence at issue was offered at
the guilt/innocence phase of the trial. 
Second, it constitutes Asame transaction
contextual evidence.@

Same transaction contextual evidence Aimparts to the
trier of fact information essential to understanding the context and
circumstances of events which, although legally separate offenses, are blended
or interwoven.@  Camacho
v. State, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993).  Such evidence is not admitted for the purpose
of showing conformity, but to illuminate the nature of the crime alleged.  Id. 
When evidence of an extraneous offense is offered at punishment, it is
offered to assist the jury in evaluating the defendant=s character for
the purpose of assessing punishment, and the State, therefore, must prove the
defendant committed the extraneous offense because it is used as evidence
against the defendant.  Garza v. State,
2 S.W.3d 331, 335 (Tex. App.CSan Antonio 1999,
pet. ref=d).  However, where such evidence is presented as
same contextual evidence, the State is not offering the evidence to prove the
defendant=s characters, but to explain the
surrounding circumstances and a reasonable doubt instruction is not
required.  Id.; see also
Duchane v. State, 2002 WL 232851, at *5 (Tex. App.CDallas Feb. 8,
2002, no pet.) (not designated for publication); Hatton v. State, 2000
WL 350539, at *1 (Tex. AppCHouston [14th
Dist.] Apr. 6, 2000, no pet.) (not designated for publication).  








Here, the one-pound transaction with which
appellant was charged, was the culmination of several days of negotiations
between her and Martinez.  Initially,
appellant gave Martinez a sample after he had requested seven pounds.  Whether Martinez, as the buyer, found the
sample acceptable would determine whether he and appellant would continue with
the sale.  Appellant then informed
Martinez that she could obtain a more potent form of methamphetamine, which
required the delivery of another sample to Martinez so that he could decide
which potency he wanted to purchase. 
Although Martinez had originally requested seven pounds, appellant
informed appellant that she would initially sell one-half pound to make sure
that everything went smoothly.  When
appellant and Martinez discussed the delivery and purchase of the remaining six
and one-half pounds, appellant informed Martinez that she would only sell him
two pounds; however, appellant and the three men showed up with only one pound.  Such activities were interwoven with the
delivery of the one pound of methamphetamine for which appellant was charged
and, as such, was clearly same transaction contextual evidence.  

Moreover, such evidence was necessary to
put appellant=s role in the June 3rd, one-pound
transaction in its proper and complete context. 
Because appellant had delivered two samples, had participated in the of
one-half pound transaction, and had negotiated the sale of two pounds and seven
pounds of methamphetamine, such evidence tended to show appellant knew the
contents of the Frosted Flakes box, rather than being an innocent bystander
during the transaction when one of the men handed the box to Martinez.  We conclude, therefore, a reasonable doubt
instruction was not required.  








Even if a reasonable doubt instruction
were required, we do not find that such error in the trial court=s failure to sua
sponte instruct the jury constitutes egregious error.  Almanza[1]
sets forth the appropriate harm analysis for error in not instructing the jury
under article 37.07 on reasonable doubt for extraneous offenses and bad
acts.  Huizar, 12 S.W.3d at
483.  Therefore, when a defendant fails
to object to the trial court=s failure to
include an instruction under article 37.07, jury charge error does not require
reversal unless it is so egregious that the defendant was denied a fair and
impartial trial.  Almanza, 686
S.W.2d at 171.  A[T]he actual
degree of harm must be assayed in light of the entire jury charge, the state of
the evidence, including the contested issues and weight of probative evidence,
the argument of counsel and any other relevant information revealed by the
record of the trial as a whole.@  Id. 


The evidence from the guilt-innocent stage was reintroduced
at the punishment stage of trial. 
Appellant complains that during jury argument, the prosecutor emphasized
the extraneous offenses:

A. . . You might
think about the minimum if that State Exhibit 4 were the only thing that you
knew about her.  Well, but, you know,
that=s not true.  You know State Exhibit 4, a pound of dope,
was part of a seven pound deal.  That=s just another one
of the installments that she already sold half pound [sic], she=s out delivering
samples.  This is not a minimal player,
so that is what you kind of need to move her away from that minimum
side. . . . Well, [appellant] has dealt a seven pound deal, she
made several deliveries . . .@

Appellant=s testimony that
she did not know the two samples in the Cheez-It and Frosted Flakes boxes
contained methamphetamine is contradicted by (1) the testimony of Martinez and
the officers involved in the surveillance, (2) the appellant=s presence, and
(3) the appellant=s admission, in her hand-written
statement, that she Acalled around@ to locate some
glass for Martinez, delivered samples on two separate occasions, delivered
one-half pound of Acrystal@ for seven
thousand dollars, and delivered one pound Aof crystal to the
parking lot and it would of been for fourteen thousand.@  

Appellant=s testimony is
also contradicted by her own testimony and other actions.  For example, appellant testified that she was
eating crackers from the same box that contained the one-half pound of
methamphetamine, which she gave to Martinez, but did not know that it contained
any drugs.  Appellant also testified that
getting paid $500 for the transaction was not enough for her to break the law,
but that she did it Aout of love for [Martinez].@  








Finally, we observe the punishment
assessed by the jury is well-within the range of punishment; indeed, it is at
the lower end of the range.  The prosecutor
requested that the jury assess a prison sentence of 50 years.  Although, the range of punishment is 15 to 99
years= confinement and a
fine of up to $250,000, the jury assessed punishment at 20 years= confinement and a
$500 fine.  We do not find the error, if
any, so egregious that appellant was denied a fair and impartial trial.  

Appellant=s sole issue is
overruled and the judgment of the trial court is affirmed.  

 

 

 

 

/s/      J. Harvey Hudson

Justice

 

 

 

 

Judgment
rendered and Opinion filed June 15, 2004.

Panel
consists of Justices Yates, Anderson, and Hudson.

Do
Not Publish C Tex.
R. App. P. 47.2(b).











[1]  Almanza v.
State, 686 S.W.2d 157 (Tex. Crim. App. 1984) (op. on reh=g).